FENCL-TUFO CHEVROLET, INC., Appellant, v. THE INDUSTRIAL COMMISSION (Edward L. Weese, Appellee).

First District (Industrial Commission Division)  No. 1—87—1958WC

Opinion filed April 20, 1988.

Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellant.

Murges, Bowman & Corday, Ltd., of Chicago, for appellees.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Edward Weese, filed an application for adjustment of claim alleging injuries arising out of his employment on October 27, 1984. On July 23, 1986, the arbitrator found that claimant's condition was causally connected to the accident, that claimant was temporarily totally disabled from October 28, 1984, to June 25, 1986, and that claimant was entitled to $10,752.93 of reasonable and necessary medical expenses.

The Industrial Commission (Commission) affirmed the arbitrator's decision, and the circuit court of Cook County confirmed the Commission's finding. This appeal followed.

On appeal, respondent raises the following issues: (1) the Commission erred in allowing into evidence the records of numerous physicians over its hearsay objection; (2) the Commission improperly awarded temporary total disability benefits despite claimant's repeated refusals to honor respondent's requests for medical information; (3) the Commission's award of temporary total disability was against the manifest weight of the evidence; (4) the Commission erroneously awarded medical expenses of service providers beyond petitioner's first two choices; and (5) the Commission erred in awarding medical expenses already paid by a nonparty and for which petitioner is not liable.

At the time of the accident, claimant was a 27-year-old journey-

man mechanic working for respondent. Claimant testified that he was installing a drive shaft in a light truck when the vehicle's forward gear apparently became engaged. Claimant stated that he was standing in front of the truck with his back to it. The vehicle rolled forward and pinned him against a steel workbench and concrete wall. He was taken by ambulance to Glendale Heights Community Hospital, where he complained of "severe left lower quadrant pain and pain extending around the left thigh into the left sacral area." He was diagnosed as having a contusion injury of the soft tissues of the left pelvic and thigh regions. Claimant was released from the hospital on November 1, 1984.

Claimant testified that on October 3, 1984, he had given respondent 30-day notice of his intention to terminate his employment. He was returning to Michigan to work as a machinist for his father. Claimant left Illinois on November 3, 1984, and took up residence in Shelby, Michigan. He initially came under the care of Dr. C. A. Johnson of the New Era (Michigan) Family Practice Clinic (clinic), a one-physician practice located in a rural area.

Dr. Johnson referred claimant to Dr. John LeClaire, who performed EMG's on claimant on November 30, 1984, and December 21, 1984. Dr. LeClaire concluded that there appeared to be an isolated lesion to the motor branch of the superior gluteal nerve which innervated the gluteus medial muscle. Claimant was admitted to Mercy Hospital, Muskegon, Michigan, on December 27, 1984, for sympathetic nerve block treatment and trigger point injections. At Mercy Hospital, Dr. Singer served as his treating physician.

Dr. Johnson referred claimant to Dr. D. Cavender at Muskegon's Hackley Hospital for another EMG, which was performed on March 22, 1985. The results indicated a "severe incomplete lesion of the left superior gluteal nerve." Dr. Cavender also noted "posterior myotome findings in the left L5, S1 distribution which were not previously reported." He found no significant improvement from prior EMG's.

Dr. Johnson subsequently referred claimant to Dr. Van Nuis, a Grand Rapids neurologist, who examined him on April 10, 1985. Dr. Van Nuis concluded that there appeared to have been some injury to the superior gluteal nerve with a denervation in the gluteus media. He also noted that from a review of previous EMG's, it was evident that claimant was experiencing lumbosacral radiculopathy. Dr. Van Nuis indicated that the claimant's recovery might be slow.

At the request of respondent's insurer, claimant saw Dr. Oliver Grin on July 3, 1985. At this examination, Dr. Grin observed evidence of a superior gluteal nerve injury. He was also concerned about claim-

ant possibly having "an intraspinal process" and therefore recommended a lumbar myelogram. Claimant was admitted to Blogett Hospital in Grand Rapids, Michigan, on July 17, 1985, and he was subsequently discharged on July 20, 1985. Claimant underwent a lumbar myelogram on July 18, 1985; the results were unremarkable. He was instructed to "stay off work" and to arrange an appointment with Dr. Grin in one or two weeks. Claimant testified that he contacted Dr. Grin after this hospitalization and that Dr. Grin wanted to set a follow-up appointment six months later.

Some time in 1985, Dr. Johnson, apparently for financial reasons, sold the clinic's practice to Dr. La Violette who, in turn, sold the practice to Dr. Craig Weisse in or about September 1985.

On November 22, 1985, Dr. LeClaire performed another EMG on claimant. He concluded that the test results were consistent with a severe lesion to the superior gluteal nerve and that claimant's neuropathy had gotten worse since his prior EMG on March 22, 1985.

Dr. Weisse referred claimant to Dr. Scott Lachniet, a Muskegon orthopedic surgeon, who, in turn, referred him to the University of Michigan Hospital's neurosurgery department, where he was examined on December 9, 1985, by Drs. Hoff and Randall. They opined that he had a post-traumatic pain syndrome which had been unresponsive to conservative therapy. Claimant was then referred to the hospital's pain clinic, where Dr. Michael de Rosayro treated him. Several nerve blocks were administered to claimant; these provided only temporary relief of his symptoms. Dr. de Rosayro, who saw claimant four or five times in the early months of 1986, diagnosed claimant's medical condition as a reflex sympathetic dystrophy, a syndrome that results from a nerve injury. On March 5, 1986, claimant underwent a lumbar sympathectomy. The record does not reflect this operation's impact on his condition.

At the arbitration hearing, claimant admitted to performing some light work around the home. He had taken part in a men's golf league on four occasions, in which he played nine holes and rode in a golf cart. Claimant did some light yard work, including the planting of a few flowers, and oversaw the daytime care of his children.

■ Initially, respondent contends the Commission erred in allowing into evidence and considering the records of numerous physicians over respondent's hearsay objection. At the arbitration hearing, claimant sought to introduce into evidence a number of physicians' records under section 16 of the Workers' Compensation Act, which provides in pertinent part:

"The records kept by a hospital, certified to as true and cor-

rect by the superintendent or other officer in charge, showing the medical and surgical treatment given an injured employee in such hospital, shall be admissible without any further proof as evidence of the medical and surgical matters stated therein, but shall not be conclusive proof of such matters." Ill. Rev. Stat. 1985, ch. 48, par. 138.16.

Respondent objected to these exhibits on hearsay grounds, claiming an inability to cross-examine the physicians and the failure of the physicians to comply with respondent's subpoenas so that the records could be reviewed for completeness. The arbitrator admitted the records into evidence over respondent's objections.

Respondent argues that since the rules for admissibility of evidence in workers' compensation proceedings are the same as in common law cases, an exhibit which is clearly hearsay may be admitted only if it is shown to be trustworthy. Respondent further contends that where treating physicians' reports are introduced and the opposing party objects to their admission on hearsay grounds and is unable to cross-examine the physicians, the reports must be excluded. *American Smelting & Refining Co. v. Industrial Comm'n* (1933), 353 Ill. 324.

Claimant asserts that the rule against the admission of hearsay evidence is not absolute and that, under certain circumstances, the probability of the evidence's accuracy and trustworthiness may act as a substitute for cross-examination under oath. (*United Electric Coal Co. v. Industrial Comm'n* (1982), 93 Ill. 2d 415.) Claimant points out that respondent objects to the hearsay nature of the evidence and not to any lack of proper certification pursuant to section 16 (Ill. Rev. Stat. 1985, ch. 48, par. 138.16).

In *United Electric Coal Co.*, which is cited as support by both parties, the disputed reports and audiograms were based on examinations performed upon claimant by a specialist to whom he had been referred by his family physician for evaluation and treatment. The audiograms had been examined by respondent's medical witness, whose examination of them formed the basis of his opinion regarding claimant's condition. The court found that, under the circumstances, the disputed documents were sufficiently accurate and trustworthy to be admitted in evidence.

In the instant case, claimant's exhibits Nos. 13, 14, 16, and 19, all of which respondent objected to on hearsay grounds, were EMG reports. Claimant contends that these are as inherently trustworthy as the documents admitted in *United Electric Coal Co.* We agree. These reports were not prepared for litigation purposes but were created to

assist in the treatment of claimant's injury. Also, as was the case in *United Electric Coal Co.*, the respondent's medical witness had examined the disputed reports and, apparently, these served, to some extent, as the basis of his opinion regarding claimant's condition.

Respondent objected to the admission of the reports of Drs. Johnson, La Violette, Van Nuis, Weisse, and Lachniet. Again, these physicians' reports were not made for litigation purposes but were created in the course of treating claimant's injury and were reviewed by respondent's medical witness. There is little reason to suspect the trustworthiness of these exhibits.

Exhibit No. 17 was the report of Dr. Grin, the physician to whom respondent's insurer had referred the claimant. Respondent was in no position to argue against admission of this evidence.

■ Next, respondent contends that the Commission's award of temporary total disability benefits was improper due to petitioner's refusal to honor respondent's request for medical examination. Respondent requested that claimant be examined by Dr. James Dupre. The appointment was scheduled for October 28, 1985; claimant was advanced $301.05 for expenses. Claimant admitted knowledge of the appointment and receipt of the check but failed to show up for the appointment. As a result, respondent argues that claimant cannot collect temporary total disability benefits for the period of time he failed to keep the requested appointments. Section 12 of the Workers' Compensation Act provides in pertinent part:

> "If the employee refuses so to submit himself to examination or unnecessarily obstructs the same, his right to compensation payments shall be temporarily suspended until such examination shall have taken place, and no compensation shall be payable under this Act for such period." Ill. Rev. Stat. 1985, ch. 48, par. 138.12.

Citing *Fuller v. Industrial Comm'n* (1981), 86 Ill. 2d 131, respondent argues that section 12 denies temporary disability benefits to a claimant failing to honor a request for a medical examination.

*Fuller* is clearly distinguishable from the instant case. The sketchy facts of *Fuller* are as follows: an arbitrator awarded claimant $76 per week for 64 weeks of temporary total disability and $68 per week for 110 weeks for an accident occurring on January 17, 1966. The award was made on January 28, 1970. After said award, respondent requested that claimant submit to a physical examination under section 12 of the Act. Due to reasons not reflected in the record, claimant failed to comply with the request. On March 28, 1972, the Commission entered an order suspending compensation benefits due

to claimant's failure to submit to the examination.

Six years later, claimant filed a petition to vacate the order suspending compensation benefits and stated that, because he was then prepared to submit to the examination, the 1972 order should be vacated. The court acknowledged that the statute does not provide the time within which a claimant must comply, but it did not construe the term "temporarily suspended" to mean a six-year waiting period for compliance. The court held that it was unreasonable for a claimant to wait six years before seeking to comply with an order to submit to an examination.

The present case bears little resemblance to *Fuller*. Here respondent had unilaterally suspended claimant's payments effective June 16, 1985. Evidently respondent decided to suspend payment after getting a report from Susan Blue, a private investigator who, in June 1985, had observed claimant playing golf on *one* occasion. This is negligible evidence upon which to summarily suspend total temporary disability benefits. Unlike the respondent in *Fuller*, this respondent made no effort to petition the Commission for a suspension of payments; it simply terminated them.

Upon suspending payments, respondent requested that claimant submit to an examination by Dr. Oliver Grin of Grand Rapids. Despite the suspension of payments, claimant submitted to an examination by Dr. Grin on July 3, 1985. Further, Dr. Grin admitted claimant to Blodgett Hospital from July 17 to July 20, 1985, for a lumbar myelogram. The test results were inconclusive. Upon discharge, claimant was advised not to return to work and to contact Dr. Grin in one or two weeks. Claimant called Dr. Grin and was told to recontact him in six months for a follow-up appointment.

In October 1985, respondent requested that claimant be examined by Dr. James Dupre. At this time, respondent still was not paying him temporary total disability. Claimant failed to attend an examination set for October 28, 1985.

Claimant argues that under these circumstances there was little to gain from attending Dr. Dupre's examination. We thoroughly agree. It is apparent to us that respondent was proceeding in a manner that did not warrant compliance. Accordingly, we find that when, as here, an employer has arbitrarily suspended payments, and a claimant has already complied with one requested examination, the claimant's failure to attend a further examination does not violate section 12.

■ Next, the respondent argues that the Commission's decision is against the manifest weight of the evidence. It is axiomatic that a

reviewing court will not disturb the Commission's decision unless it is against the manifest weight of the evidence. (*Luckenbill v. Industrial Comm'n* (1987), 155 Ill. App. 3d 106.) Respondent asserts that claimant failed to show sufficient proof of the need for his ongoing treatment and alleged inability to work. It contends that the Commission's reliance on the testimony of Dr. de Rosayro is misplaced because his expertise is in anesthesiology. Further, respondent interprets the testimony of Dr. de Rosayro to demonstrate the petitioner could have found gainful employment but failed to make any effort to do so. Respondent specifically points to Dr. de Rosayro's statements that there was no objective evidence by which to prove or disprove the existence of petitioner's condition and that patients with similar conditions had required only three to six months' convalescence. Respondent also finds it significant that Dr. de Rosayro would not put any restrictions on an individual with claimant's condition other than to limit his activities as tolerated.

Respondent also cites the testimony of Dr. James Dupre, the respondent's examining physician, in support of its contention regarding the weight of the evidence. Dr. Dupre, a neurosurgeon, reviewed the treating records and EMG reports and determined there was no objective evidence of claimant's alleged disability in the medical reports. Dr. Dupre testified that, based on those records, petitioner would have been able to resume his normal activities, including a return to gainful employment at the time the records were made.

Dr. Dupre also testified that he examined claimant on May 19, 1986, and found no objective evidence of any disability. Based on this examination, he determined that claimant was capable of gainful employment with no need to restrict his activities.

Claimant counters that Dr. de Rosayro was head of the University of Michigan Pain Clinic and had extensive experience in working with people whose pain is subjectively based. Dr. de Rosayro testified that he had examined claimant in January 1986 and saw him four or five times in the next three months. Based on these examinations, he thought that claimant was unable to perform any physical work and was unable to walk without pain. Dr. de Rosayro further opined that claimant had been totally disabled between June 1985 and January 1986.

Claimant also points out that of all the numerous physicians to examine him since the accident, Dr. Dupre is the only one to find that he was able to return to gainful employment. Specifically, Dr. Cavender administered an EMG on March 22, 1985, and found that the test results indicated a severe incomplete lesion of the left superior gluteal

nerve. On November 22, 1985, Dr. LeClaire performed an EMG on claimant and concluded the results were consistent with a severe lesion of the superior gluteal nerve and that claimant's neuropathy had worsened. This evidence strongly supports claimant's position.

Based on this evidence, we conclude that the Commission's decision was not against the manifest weight of the evidence. *Oros v. Industrial Comm'n* (1967), 37 Ill. 2d 568.

■ Next, respondent asserts that the Commission erroneously awarded medical expenses of service providers beyond claimant's first two choices and that the service provider's chain of referrals was without respondent's authorization. (Ill. Rev. Stat. 1985, ch. 48, par. 138.8(a).) Respondent cites claimant's testimony to support its contention. Claimant stated that on November 3, 1984, he came under the care of the first selected physician, Dr. C. A. Johnson of the New Era (Michigan) Family Practice Clinic (clinic). Petitioner testified that Dr. Johnson sent him to Dr. LeClaire for purposes of an EMG and that Dr. LeClaire, in turn, sent him to Drs. Singer and Van Nuis. Dr. Johnson left the clinic, selling the practice in 1985 to Dr. La Violette. Respondent contends this is claimant's second choice of physician because Dr. Johnson, upon departing the clinic, did not specifically refer claimant to Dr. La Violette.

After Dr. La Violette was apparently unable to purchase the clinic's practice, Dr. Craig Weisse took his place at the clinic. Respondent contends that Dr. Weisse was claimant's third choice of physician. Dr. Weisse, in turn, referred claimant to Dr. Lachniet, who then referred claimant to the University of Michigan Hospital. As such, respondent contends that it should not be responsible for any medical expenses following claimant's alleged second choice of physicians (Dr. La Violette).

The Commission found that the claimant selected the clinic as his first medical provider and that it constituted one provider; each subsequent physician was a referral from the prior physician. We agree. As claimant notes, the population of his rural Michigan locality was sparse and could not support extensive medical services. The departure of the single doctor in such an area and subsequent assumption of the practice by another physician does not constitute a discreet choice of physician by claimant. Rather, these changes represent further links in the chain of referrals arising from claimant's first choice of the clinic. The Commission correctly found that claimant had not violated the procedure in section 8(a) and, therefore, was entitled to the relevant medical expenses. Respondent's reliance on *Wolfe v. Industrial Comm'n* (1985), 138 Ill. App. 3d 680, is misplaced because

the facts of the instant case are readily distinguishable.

■ Finally, respondent argues that the Commission erred in awarding medical expenses already paid by a nonparty and for which claimant is not liable. Claimant introduced medical bills totaling $6,710.07 which were paid by the State of Michigan's Department of Social Services (Michigan) because respondent refused to pay them and claimant was unable to do so. Respondent argues that Illinois case law provides that an individual is not entitled to the reasonable value of services, including medical treatment that he obtained without expense, obligation, or liability. *Peterson v. Lou Bachrodt Chevrolet Co.* (1979), 76 Ill. 2d 353.

Respondent's reliance on *Peterson* is misplaced because of distinguishing facts. In *Peterson* the plaintiff received free medical care from the Shriner's Hospital for Crippled Children and was attempting to claim the value of the services rendered in an apparent attempt to inflate the damages in his case. The court refused to allow it because there was no obligation for anyone to pay the hospital, which provided the services gratuitously.

Claimant points out that the services were not rendered to him gratuitously. Each bill paid by the State of Michigan was stamped as follows:

> "All or part of this bill was paid by the Michigan Medicaid program. The Department of Social Services is subrogated, to the extent of its expenditures, to the Medicaid recipient's right of reimbursement for medical care expenses, from any third party liable. MCLA 400.106, MSA 16.490(16). This constitutes notice that reimbursement for such expenditures should be made to no party other than the Michigan Department of Social Services."

Clearly, claimant has the legal obligation to reimburse Michigan for these medical payments.

Further, respondent's argument is patently against Illinois case law and public policy. As our supreme court stated in *Shell Oil Co. v. Industrial Comm'n*:

> "[T]he burdens of caring for the casualties of industry should be borne by industry and not by the individuals whose misfortunes arise out of the industry, *nor by the public.*" (Emphasis added.) (*Shell Oil v. Industrial Comm'n* (1954), 2 Ill. 2d 590, 596.)

Here, the respondent is attempting to make Michigan pay for medical expenses that are its legitimate responsibilities. The Commission properly found that the respondent should pay those medical expenses

520

previously paid by Michigan.

For the reasons stated above, we uphold the circuit court of Cook County's affirmance of the Industrial Commission's decision in this case.

Affirmed.

BARRY, P.J., and McNAMARA, McCULLOUGH, and CALVO, JJ., concur.