CHICAGO MESSENGER SERVICE, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Abdelhafidh Chichti, Appellee).

First District (Illinois Workers' Compensation Commission Division)
No. 1—04—1478WC

Opinion filed March 30, 2005.

O'Hagan, Smith & Amundsen, L.L.C., of Wheaton (Gale A. Galante, of counsel), for appellant.

Bradley S. Dworkin, of Chicago, for appellee.

JUSTICE HOLDRIDGE delivered the opinion of the court:

Abdelhafidh Chichti filed a workers' compensation claim against his employer, Chicago Messenger Service (CMS), claiming that on September 11, 2001, he sustained a compensable accident under the Workers' Compensation Act (the Act) (820 ILCS 305/1 *et seq.* (West 2000)). The matter proceeded to arbitration where the arbitrator found that Chichti sustained a compensable accident on that date. The arbitrator awarded temporary total disability (TTD) benefits for $26^3/_7$ weeks (September 15, 2001, through March 18, 2002) and medical expenses in the amount of $7,917.56. The Illinois Industrial Commission[1] (Commission) modified the TTD award to $52^5/_7$ weeks (September 15, 2001, through September 18, 2002) and otherwise adopted the arbitrator's decision. The decision of the Commission came with one dissent. Commissioner Stevenson found that the claimant had failed to prove an accidental injury arising out of and in the course of the claimant's employment. On review, the Cook County circuit court confirmed the Commission's decision. CMS now brings this appeal, claiming the Commission erred in finding that: (1) the claimant proved he suffered an accidental injury arising out of and in the course of his employment; and (2) the Commission erred in finding that the claimant proved he was temporarily totally disabled on and after September 11, 2001.

For the following reasons, we reverse the decision of the Commission and remand for further proceedings.

## BACKGROUND

The claimant was employed by CMS as a delivery driver. CMS provided drivers to European Imports, Inc., a company that supplied food products to small restaurants in the Chicago area. The drivers made deliveries in trucks owned by European. European employees loaded the trucks each day, and the CMS drivers reported to European's loading dock to obtain their delivery route for the day. The drivers used dollies or hand trucks to deliver items to the restaurants

---

[1]Renamed the Illinois Workers' Compensation Commission. See Pub. Act 93—721, eff. January 1, 2005.

on their routes. Each route consisted of approximately 15 to 25 stops, with approximately 15 packages at each stop. Each item weighed between 1 and 40 pounds, with most items weighing around 20 pounds. CMS drivers carried CMS pagers and phones to enable them to contact CMS directly during their routes.

## Testimony of the Claimant

The claimant testified that on September 11, 2001, while cn the second- or third-to-the-last stop on his route, he was lifting a 45-pound package when he heard a clicking in his lower back. He continued working and finished his deliveries. He brought the truck back to European and then went home and took a bath. That evening he experienced severe back pain that became progressively worse. On the morning of September 12, 2001, his back was still hurting. He sneezed and felt severe lower back pain.

The claimant testified that he called his CMS supervisor, Paul Korzen, who was stationed at European. He told Korzen that he had hurt his back the previous day lifting a heavy box and that he had experienced a sharp pain while sneezing that morning. He told Korzen that he was coming in to work, but he did not know if he could work that day.

The claimant reported for work and had a conversation with Tom Ruiz, a dispatcher at European. The claimant testified that he told Ruiz that he had injured himself at work the previous day but kept working because there was nobody available to complete his route. The claimant testified that another dispatcher was also present during this conversation.

The claimant testified that he next had a conversation with Korzen in person. According to the claimant, he again told Korzen that he injured himself the previous day while making deliveries and that he had experienced further pain when he sneezed the next morning. He claimed that Korzen asked him if the sneezing caused the pain and that he answered in the negative—that the pain started the previous night. Claimant further testified that Korzen told him that he had a short route of only five stops that day and he could then have the next two days off. The claimant agreed to work. He further testified that he was accompanied by a friend, Mehir Sahabi, who did all the driving and lifting for the claimant on the route that day.

The claimant next testified that on the evening of September 15, 2001, he went to the emergency room at Christ Hospital. He gave a history of lower back pain starting four days prior while lifting heavy boxes at work.

The claimant also testified that he informed Bill Factor, owner of

CMS, of "exactly what happened." The date of this conversation is unclear, although it appears to have occurred some weeks after September 15, 2001.

## Medical Records of Christ Hospital

Medical records from the hospital indicate that the claimant presented at the emergency room at approximately 8 p.m. on Saturday, September 15, 2001. He told the nurse that he had lower back pain that started the prior Tuesday while lifting heavy boxes at work. He was then examined by Dr. Matthews, who recorded that the claimant indicated he was lifting a 50-pound box five days prior when he heard something pop. Dr. Matthews diagnosed lumbar strain, prescribed pain medication and recommended a follow-up at the Adult Medicine Clinic within a week.

The medical records of Christ Hospital indicate that the claimant returned to the emergency room on October 16, 2001, complaining of lower back pain. The record indicates that the claimant had not followed up with clinical treatment as recommended by Dr. Matthews. The diagnosis was lumbosacral pain. The claimant was referred to Midwest Orthopedics.

## Other Medical Records

On October 18, 2001, the claimant was examined by Dr. Lim, an orthopedic surgeon at Midwest Orthopedics. The claimant gave a history of injury at work on September 11, 2001. The diagnosis was lumbar radiculopathy.

On October 31, 2001, the claimant sought treatment from Dr. Fortier at the Alpha Pain Treatment Center. The claimant complained of lower back and right leg pain following an injury at work. The diagnosis was lumbar disc herniation and lumbar radiculitis. Physical therapy was prescribed. Dr. Fortier treated the claimant through December 12, 2001. The records contain no work restrictions issued by Dr. Fortier.

On November 28, 2001, the claimant was examined by Dr. Sarantopoulos. Again, the claimant complained of lower back pain resulting from a work-related injury on September 11, 2001. Dr. Sarantopoulos diagnosed disc herniation and lumbar radiculopathy and prescribed injections.

On January 30, 2002, the claimant again was examined by Dr. Fortier, who recommended continued physical therapy and a surgical consultation.

On March 12, 2002, the claimant was examined at the request of the employer by Dr. Richard Blonsky, a board-certified neurologist and specialist in pain medication. Dr. Blonsky found the claimant had

significant preexisting degenerative disc disease, which made him more susceptible to disc herniation due to sneezing, twisting or arising from a chair.

On March 13, 2002, Dr. Fortier issued a written report to the claimant's attorney. In that report, Dr. Fortier opined that the claimant's current state of ill-being was causally related to a workplace injury on September 11, 2001.

## Testimony of Paul Korzen

Paul Korzen testified that he was employed by CMS as the supervisor of European drivers. Korzen noted that the claimant spoke broken English, but he had never had any difficulty understanding the claimant. Korzen testified that on September 11, 2001, the claimant performed his normal route and reported nothing out of the ordinary. Korzen testified that on September 12, 2001, he had a conversation with the claimant on the dock at European. The claimant was walking stiffly and, when queried, told Korzen he had hurt his back while drinking coffee and sneezing that morning. The claimant said nothing about an on-the-job injury the previous day. When Korzen asked if the claimant could work that morning, he was told by the claimant that he would work because he needed the money. Korzen testified that Tom Ruiz, a dispatcher who was standing nearby, laughed when he heard how the claimant had injured himself.

Korzen testified that the claimant came to the CMS office a few days later, apparently to discuss his off-work status. An impromptu meeting then took place with the claimant. The meeting was also attended by Tony Lopez, a CMS dispatch manager, and Milton Buzil, the general manager of CMS. Korzen testified that at this meeting, the claimant again stated that he had hurt his back when he sneezed while drinking a cup of coffee at home on the morning of September 12, 2001.

## Testimony of Tom Ruiz

Tom Ruiz testified pursuant to subpoena. At the time of the hearing, he had been employed by Hespex, Inc., for approximately one month. Prior to that, he had been employed by European, Inc., for four years as a dispatcher. Ruiz testified that on September 12, 2001, he had a conversation with the claimant in front of the dispatcher's office at European. Ruiz stated that the claimant was there with a companion. The claimant was limping. The claimant told Ruiz that he was drinking coffee and sneezed that morning and his back went out. He made no mention of an on-the-job injury the previous day.

## Testimony of Tony Lopez

Tony Lopez testified pursuant to subpoena. At the time of the

hearing, he was employed by Capital Retail, Inc. Before then, he had been employed by CMS as a dispatch manager. Lopez testified that on or about September 13, 2001, he took a telephone call from the claimant. According to Lopez, the claimant told him that he hurt his back while at home. He told Lopez he was drinking coffee when he twisted his back and felt a snap. Lopez testified that the claimant told him nothing regarding an on-the-job injury.

### Testimony of Milton Buzil

Milton Buzil, general manager of CMS, testified that he first heard of the claimant's injury when an orthopedist contacted CMS regarding insurance. Buzil was present at the same meeting described by Korzen. Buzil testified that the claimant told them that he was eating breakfast on the morning of September 12, 2001, when he sneezed while drinking coffee. When he sneezed, he hurt his back. Buzil testified that the claimant made no mention of hurting his back while lifting boxes at work.

### Testimony of Mehir Sahabi

Mehir Sahabi testified for the claimant. Sahabi was a friend of the claimant. He had been employed by CMS as a driver for European until June 2001, having driven the same route as the claimant. In fact, Sahabi had trained the claimant. On September 11, 2001, Sahabi was visiting from out of state and was staying at the claimant's home. Sahabi testified that, on the morning of September 12, the claimant asked him for a ride to work. Sahabi drove the claimant to work. He then went on the route with the claimant. Sahabi did all the driving and the lifting on the route that day. He testified that they worked for 5 1/2 hours. Sahabi did not testify as to any statements made to him about how the claimant came to be injured.

### The Decision of the Arbitrator

The arbitrator found that the claimant had sustained his burden of proving an injury arising out of and in the course of his employment. An extensive quote of the arbitrator's decision is necessary to understand this determination:

> "The petitioner proved that he sustained an injury that arose out of and in the course of his employment. It is noted that the petitioner has little credibility, which is due to his statements attributing his back injury to sneezing while drinking coffee and his refusal to claim a work injury when he met with Paul Korzen, Tony Lopez and Milton Burzel. However, more weight is given to the statements he gave to his initial medical providers, wherein he gave a history of back injury from lifting while working. It is assumed that one seeking medical care will be truthful regarding the

nature and cause of their condition in order to receive proper medical care."

The Commission, with one dissent, adopted the arbitrator's conclusion. Commissioner Stevenson, in his dissent, determined that the claimant never gave a history of injury at work to his employer until he testified at hearing. The circuit court of Cook County confirmed the decision of the Commission. CMS appealed to this court.

## ANALYSIS

CMS first maintains on appeal that the Commission's finding that the claimant proved an injury arising out of and in the course of his employment was against the manifest weight of the evidence. It is, of course, axiomatic that the Commission's determination of such matters must be affirmed unless its finding is against the manifest weight of the evidence. *Lenhardt Tool & Die Co. v. Industrial Comm'n*, 232 Ill. App. 3d 693, 696 (1992). Under the manifest weight standard, the question is not whether a reviewing court or any other tribunal might reach the opposite conclusion. *Lenhardt*, 232 Ill. App. 3d at 696. Rather, a decision is reversible only if the opposite conclusion is clearly apparent or evident from the record. *Water Pipe Extension v. City of Chicago*, 195 Ill. App. 3d 50 (1990); see also *LeFebvre v. Industrial Comm'n*, 276 Ill. App. 3d 791, 797 (1995).

It is also well settled that it is within the province of the Commission to judge the credibility of witnesses. *Elliott v. Industrial Comm'n*, 303 Ill. App. 3d 185 (1999). However, this rule does not relieve a reviewing court of its duty to reverse a finding of the Commission under appropriate circumstances, even where testimony, standing alone, would be sufficient to sustain an award. *State House Inn v. Industrial Comm'n*, 32 Ill. 2d 160, 164 (1965). Ultimately, an award which appears against the manifest weight of the evidence, upon consideration of all testimony and circumstances, must be set aside. *State House*, 32 Ill. 2d at 164.

Here, when reviewing all testimony and circumstances in the record, we find that the opposite conclusion to that reached by the Commission is clearly apparent or evident. There was no witness to the accident other than the claimant. While a claimant's testimony, standing alone, can be sufficient to establish an accident (see *State House*, 32 Ill. 2d at 164), this claimant, according to the Commission, gave conflicting statements as to how his injury occurred. The claimant testified at the hearing, under oath, that he told Korzen, Ruiz, Lopez and Buzil that he was injured lifting a box while making deliveries on September 11, 2001. But each of those witnesses testified that he told them no such thing. Rather, their testimony was that he told

each of them that he had injured himself at home on September 12, 2001, drinking coffee and sneezing. While Korzen and Buzil may have been biased, Ruiz and Lopez were former employees of CMS and their testimony was unbiased.

The Commission, adopting the arbitrator's analysis, found that the claimant had little credibility "due to his statements attributing his back injury to sneezing while drinking coffee." There is some disagreement over just how much credibility the claimant had. The Commission clearly credited Korzen, Buzil, Lopez and Ruiz when they testified that the claimant told them his injury was the result of sneezing. However, the Commission also credited the claimant's history of on-the-job injury given to the treating physician at the Christ Hospital emergency room. The Commission did not believe the claimant's testimony at hearing, under oath, that he told these individuals that he injured himself at work.

In other words, according to the Commission, the claimant lied to Korzen, Buzil, Lopez and Ruiz when he told them he was injured drinking coffee and sneezing; he told the truth to emergency room personnel when he told them he was injured lifting a box at work; and he lied again, under oath, when he testified at hearing that he told Korzen, Buzil, Lopez and Ruiz that he had been injured while making deliveries on September 11, 2001.

The Commission's findings here defy logic. It found that the claimant's testimony at hearing, under oath, was not credible, but the statements he made to the medical providers were truthful, even though not given under oath. Testimony under oath and subject to cross-examination is the benchmark of credibility. See *Fencl-Tufo Chevrolet, Inc. v. Industrial Comm'n*, 169 Ill. App. 3d 510, 514-15 (1988). If the claimant did not testify truthfully under oath, then he had no credibility.

The lynchpin of the Commission's finding is its assumption that one seeking medical care will be truthful regarding the nature and cause of his condition in order to receive proper medical care. While that may normally be a valid assumption, it simply cannot carry the day in light of the overwhelming evidence to the contrary and the claimant's general lack of credibility. Further, this assumption might be more compelling if the claimant had sought immediate medical treatment. However, here the claimant waited four days before he sought treatment.

Viewing the totality of the evidence, the Commission's finding that the claimant established his injuries arose out of and in the course of his employment is against the manifest weight of the evidence. Here, the opposite conclusion is clearly apparent. We reverse the Commission.

CMS also maintains on appeal that the claimant failed to prove he was entitled to temporary total disability benefits. As we find that the claimant failed to establish his condition of ill-being arose out of and in the course of his employment, we need not address this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County confirming the decision of the Commission is reversed. This cause is remanded to the Commission for entry of judgment consistent with this opinion.

McCULLOUGH, P.J., and HOFFMAN, CALLUM, and GOLDEN-HERSH, JJ., concur.